IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

THOMAS SCOTT SMITH,,

        Plaintiff,

v.                                                    Civil Action No. 3:13-CV-17

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION

## I.  INTRODUCTION

### A. Background

On February 18, 2013, Thomas Scott Smith filed this action under 42 U.S.C. §§ 405(g) for judicial review of an adverse decision of the Commissioner of Social Security denying his claims for disability insurance benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. §§ 401-433.[1] The Commissioner filed her Answer on May 2, 2013.[2] Mr. Smith then filed his Motion for Summary Judgment on June 1, 2013,[3] and the Commissioner filed her Motion for Summary Judgment on June 21, 2013.[4] The motions are now ripe for this Court's review, and for this report and recommendation.

### B. The Pleadings

1. Mr. Smith's Motion for Summary Judgment and Memorandum in Support.

---

[1] Docket No. 1.

[2] Docket No. 10.

[3] Docket No. 13.

[4] Docket No. 16.

2. Commissioner's Motion for Summary Judgment and Memorandum in Support.

## C. Recommendation

I recommend that:

1.     Mr. Smith's Motion for Summary Judgment be **DENIED** because (1) substantial evidence supports the ALJ's finding that there were jobs existing in significant numbers in the national economy that Mr. Smith could have performed given his age, education, work experience, and residual functional capacity ("RFC"); (2) the ALJ adequately accounted for all of Mr. Smith's limitations in the RFC; and (3) substantial evidence supports the ALJ's finding that Mr. Smith's subjective statements concerning his symptoms and limitations were not entirely credible.

2.     Commissioner's Motion for Summary Judgment be **GRANTED** for the reasons set forth.

## II. FACTS

### A. Procedural History

On January 18, 2007, Mr. Smith applied for Disability Insurance Benefits (Title II) and Supplemental Security Income (Title XVI) due to injuries he sustained in a work accident on June 28, 2005. (R. 158, 161.) The application for benefits was initially denied on March 5, 2007 and upon reconsideration on June 15, 2007. (R. 87-91, 92-96, 97, 98- 100, 101-103.) Mr. Smith then filed a second application for Title II benefits stemming from the same accident on January 22, 2010. (R. 170-173.) This application was denied on March 15, 2010 and again upon reconsideration on May 27, 2010. (R. 104-108, 111, 119-121.) Mr. Smith requested a hearing before an ALJ, which was held on November 3, 2011. (R. 122-123, 134-157.)  Mr. Smith, who was represented by counsel,

testified at the hearing, as did an impartial Vocational Expert ("VE"). (R. 39-80.) On December 12, 2011, the ALJ issued an unfavorable decision to Mr. Smith finding that while Mr. Smith's impairments rendered him unable to perform his past relevant work, he was not disabled during the period at issue because there were other jobs in the national economy he could have performed. (R. 24-25.) On December 12, 2011, Mr. Smith appealed this decision to the Appeals Council, which denied review of the ALJ's decision on December 20, 2012. (R. 1-6, 8.) Mr. Smith then timely brought his claim to this Court.

**B. Personal History**

Mr. Smith was born on March 5, 1973, in West Virginia. He is single and has never had children. Mr. Smith dropped out of school after the ninth grade, and thereafter worked in various construction jobs. On June 28, 2005, he sustained skull and brain injuries when he fell from a dump truck and hit his head on a trailer. He has not worked since his accident.

**C. Medical History**

The following medical history is relevant to the issue of whether substantial evidence supports the ALJ's finding that Mr. Smith was not under a disability during the period at issue, June 28, 2005 through September 30, 2008.[5]

*1. Initial Hospitalizations*

On June 28, 2005, Mr. Smith underwent emergency surgery at West Virginia University Hospitals to repair an "open depressed skull fracture with herniation of the brain through the open skull wound and out the external ear canal." (R.284.) During the operation, Dr. Larry

---

[5] Because Mr. Smith's contentions concern only issues relating to his balance, ambulation, cognitive functioning, headache pain, and methadone use, this medical history will consist only of medical facts relating to those issues. Other information regarding Mr. Smith's vision, hearing, and thumb injury will not be presented because Mr. Smith raises no arguments with regard to those limitations.

Carson performed several procedures including a "Right supratentorial temporal parietal occipital craniotomy," "Reduction of depressed skull fracture in the temporoparietal skull," "Repair of right transverse sinus laceration," "Dural repair with Duragen," "Reconstruction of depressed skull fracture," and "Insertion of post-craniotomy intracranial pressure monitor through a separate incision." (*Id.*) His postoperative diagnosis was assessed as being "open depressed right temporparietal occipital skull fracture of 5 cm and right mastoid and petrous bone fracture with depression, dural laceration, brain laceration, right transverse sinus laceration, right zygoma open fracture laceration measuring 15 x 4 cm." (*Id.*) After the surgery, his condition was noted as being stable, but guarded. (R. 286.) On July 7, 2005, Mr. Smith underwent a bedside lumbar drain to address a cerebrospinal fluid ("CSF") leak from his ear. (R. 288.) After this procedure, he was reported as "moving all extremities with full strength and his sensory function was also intact. There were no complications to this procedure, which the patient tolerated well." (*Id.*)

Mr. Smith was discharged from West Virginia University Hospitals on July 14, 2005. His condition on discharge was reported as "Ambulation - with assistance," "Self-care ability - partial to full," and "Cognitive status - alert and oriented x3." (R. 291.) After discharge, Mr. Smith was admitted to Mountain View Regional Rehabilitation Hospital for physical and occupational therapy. (R. 355-362.) Upon admittance, he was assessed as having an overall strength level of 5 out of 5, full range of motion in all extremities, and some balance issues with his right extremities. (R. 361.) Additionally, he was noted as being alert and oriented with no acute distress. (*Id.*)

On July 19, 2005, Mr. Smith was readmitted to West Virginia University Hospitals with

persistent CSF leakage from his right ear canal. (R.331.) During surgery doctors removed brain tissue from within the ear canal and middle ear and grafted abdominal wall fat into the ear canal and middle ear to prevent more CSF leakage. (R. 334-335.) After the surgery, Mr. Smith developed bacterial meningitis and was placed on a 14 day course of antibiotics. (R. 331-333.) He was discharged from West Virginia University Hospitals on July 25 and readmitted to Mountain View to continue his follow-up care. (R. 339-340.)

*2. Post-Discharge Follow-Up Examinations*

Mr. Smith was discharged from Mountain View on August 19, 2005. (R. 350-351.) At a follow-up examination on August 25, 2005, his treating physician, Dr. Wetmore, assessed him as doing well, but with some degree of difficulty walking. (R. 516.) On September 1, 2005, Mr. Smith complained of worsening right thigh pain. He denied any headaches or weakness, and his mother reported no mental status changes. (R. 518.) A physical exam on this date revealed: "Well-developed, well-nourished male in no apparent distress." (*Id.*) His gait and station were smooth and steady, and his strength was 5/5 bilaterally, but he had decreased rapid alternating movements on his right side. (*Id.*) Additionally, a CT scan of the brain on this date revealed healing of the intracranial injury and fracture with no new evidence of fluid collection. (*Id.*)

In October 2005, Dr. Russell Biundo began periodic physical examinations of Mr. Smith at Physical Medicine & Rehabilitations Specialists. On October 14, 2005, Dr. Biundo reported Mr. Smith was "doing well. His is ambulating with the use of a walker but we feel that he can be progressed to a cane." (R. 383.) In addition, Dr. Biundo noted "some slight difficulties with cerebella dysfunction, but not severely." (*Id.*) Dr. Biundo also reported that Mr. Smith's muscle strength appeared to be equal bilaterally, with slight weakness on the right side versus the left,

but that he was "showing good response to current rehab progress...and we are working on making him more and more independent." (*Id.*) Finally, he noted that Mr. Smith was still on methadone, and concluded he would "follow him up in three months and access his cognition as well to make sure he continues to do very well." (R. 383.)

At the next follow-up appointment on January 16, 2006, Mr. Smith reported that overall he was rehabilitating nicely. (R. 381.) Dr. Biundo noted that Mr. Smith "ambulates into our clinic with no assistive device with a nonantalgic gait...with some decreased cadence with ambulation."(*Id.*) Additionally, Dr. Biundo found that Mr. Smith had full range of motion in all extremities, his strength was 5/5, and he moved well in all extremities. (*Id.*) Further, he noted that Mr. Smith "performs heel walking well. He does have some slight loss of balance with toe walking. He does deep knee bend well with his eyes closed with no gross deficits." (*Id.*)

On July 17, 2006, Dr. Biundo noted that Mr. Smith was still taking Methadone on a daily basis and that "he claims if he goes without the Methadone for a day he develops headaches." (R. 380.) Dr. Biundo also reported that Mr. Smith had failed to attend a methadone clinic as previously agreed. (*Id.*) Mr. Smith reported he had been feeling well with improved strength in his extremities. (*Id.*) After an exam, Dr. Biundo noted normal reflexes, good range of motion in all extremities, and some slight loss of balance with heel to toe ambulation. (*Id.*)

On October 16, 2006, Mr. Smith told Dr. Biundo that he was weaning himself off methadone and reported no dizziness, vertigo, or other issues. (R. 380.) He claimed to be doing well, and reported doing tasks around the house such as mowing the grass. (*Id.*) A physical exam revealed his reflexes, range of motion, and balance were unchanged since July. (*Id.*) On March 19, 2007, Mr. Smith again reported that he was doing well. (R. 376.) Specifically, he reported

that his headaches were improving, he was getting around a lot better, and he denied any recent depression. (*Id.*) Dr. Biundo stated that he "continues to improve well...[a]mbulation and balance much improving." (*Id.*) In addition, he noted Mr. Smith "continues to even wean himself off of the methadone even more and doing well with this." (*Id.*)

During an annual follow-up with Dr. Carson on November, 29, 2007, Mr. Smith reported that he was no longer taking methadone, but he complained of persistent headaches. (R. 534.) Dr. Carson noted a steady gait, with no focal weakness, and concluded Mr. Smith had "made a remarkable recovery, considering the extent of his trauma." (*Id.*) On May, 15, 2008, Dr. John Brick examined Mr. Smith for frequent headaches brought on by "changes in atmospheric pressure or driving into higher elevations in a vehicle." (R. 536.) Dr. Brick postulated the headaches might be related to sinus problems and referred him to Dr. Whetmore. (R. 537.) Dr. Whetmore examined Mr. Smith on June 2, 2008, and observed a markedly deviated septum. (R. 538.) Subsequently, on July 2, 2008, Dr. Brick prescribed Neurotin for the headaches, but on September 10, 2008, Mr. Smith reported the Neurontin made him "fuzzy headed" and advised Dr. Brick "the only thing that ever helped him was the methadone that he was on before, and he wants to take narcotics again." (R. 538-540.)

*2. Physical and Psychiatric Residual Functional Capacity Assessments*

Physical Residual Functional Capacity assessments were completed in February 2007, June 2007, March 2010. On February 20, 2007, Dr. Thomas Lauderman, D.O., assessed Mr. Smith at a light exertional level, with the ability to balance, stoop, kneel, crouch, and crawl occasionally, but with no manipulative, visual, or communicative limitations. He also found Mr. Smith to be only partially credible. (R. 368-375.) In a June 6, 2007 assessment, Dr. Cindy

Osborne noted "[c]onplaints [sic] are mostly credible and support decrease in RFC to medium with height and hazard limitations." (R. 398-405.) Dr. Rogelio Lim's March 9, 2010 assessment found Mr. Smith to be at a light physical exertional level, and noted the same postural and environmental limitations as Dr. Lauderman's 2007 report. On June 5, 2007, Dr. Joseph Shaver conducted a psychiatric review of Mr. Smith's case and concluded that contrary to Mr. Smith's contention that he suffers from short-term memory loss, his medical records showed he can pay attention for at least an hour and follow written and spoken instructions. Dr. Shaver concluded Mr. Smith did not suffer from any medically determinable mental impairments.[6] (R. 384-396.)

**D. Testimonial Evidence**

Testimony was taken at the hearing held on November 3, 2011. The following portions of the testimony are relevant to the disposition of the case:

Mr. Smith testified that he lives by himself in a mobile home. (R. 52.) He has not had a valid driver's license in twenty years, and he has not driven in at least the last five years. (R. 53-54.) He also testified that his father lives only about a hundred feet away and does most of the cooking, but that he can use a microwave and takes care of his own showering and dressing. (R. 69.) As to his education level, he testified that the highest grade he completed in school was the eighth grade, and that he tried once to get a GED but he did not succeed. (R. 54-55.) He also testified that he can read the menu in a fast-food restaurant like McDonald's, write a grocery list, add and subtract, and make change with money. (R. 55-57.)

---

[6] Subsequent psychiatric reviews were completed on March 4, 2010 and May 26, 2010, but both reports indicated insufficient evidence to establish a psychiatric limitation in Mr. Smith's RFC. (R. 406-418, 429-441.)

Regarding his history of narcotics use, he testified that he abused pain pills and heroin in the two years before the accident, but was not using them at the time of the accident because he enrolled in a methadone clinic three to four weeks before the accident occurred. (R. 62.) When asked by the ALJ how long after the accident he continued to take methadone, Mr. Smith replied: "After two years after my accident, a temporary disability ran out to worker's comp or something, the doctor kind of blowed me off, told me I had to find a doctor, and that was it. Just went cold turkey. I've talked to a couple other doctors, and they would say, okay, we'll call you back, and I've never heard nothing else." (R. 62.) He also stated that he used methadone solely to help him kick his narcotics habit and that he never took methadone for any other reason. (R. 63-64.) He further stated that he has had no other problems with narcotics since he went off the methadone, although he did "withdrawal a little bit right at the two year mark when I stopped." (R. 64.) He said the withdrawal lasted approximately two weeks, and he has not abused any narcotics since then. (*Id.*)

The ALJ then questioned Mr. Smith about his headaches. Mr. Smith testified that he was still having daily headaches. (R. 65.) He stated the headaches were a continuous throb, with the pain worse at some times than at others. (*Id.*) He also testified that the pain progresses throughout the day and is usually worse in the evenings, but that he did not currently treat his headaches with any medications. (*Id.*) He mentioned that Dr. Brick once prescribed him a medicine to treat his headaches, but it made him dizzy, so he never refilled the prescription. Since then, he has not taken anything for his headaches including over-the-counter medications. (R. 66.) When asked to describe his headaches, Mr. Smith stated "it's more of a throbbing on the right side…and sometimes it's due to weather or something maybe with sinuses, it's in the front of my head more." (R. 66-67.)

Next, the ALJ asked Mr. Smith whether he has any numbness on his right side. Mr. Smith replied he had numbness "around the right side of my lips and stuff. It's not completely numb to where I can't feel at all, but it kind of feels like your hand's asleep or something, it's tingly." However, he stated that he had no numbness in his right extremities. (R. 67.) When asked whether he had any other problems with his right arm or right leg, Mr. Smith replied "[y]es, during my accident there were several nerves severed in my skull that controls my whole right side, and I had to relearn to talk and walk and everything again since the accident. I'm still not where I can run or jump or anything." (*Id.*) Mr. Smith also testified that his right side twitches daily, but that it only lasts for an instant. (R. 68.)

When questioned by his attorney, Mr. Smith stated that he only sleeps three to four hours at a time. (R. 70.) He also testified that cold weather affects the metal in his head by making it pound. (*Id.*) He further stated that his night vision is very bad, and that he cannot hold his attention on anything for very long. (*Id.*) When asked by his attorney how long he can focus on any one thing, he replied, "Not long. I really don't focus hard on anything...when I do...my eyes cross out, if I try to read my eyes will cross. It makes my head pound also." (*Id.*) As to his memory, he stated that his short term memory is "real bad." (R. 71.) Regarding hobbies, he testified that he does not have hobbies anymore, and that he tried to go fishing one time "but after an hour or so my head's hurting and just not comfortable." (*Id.*)

Larry G. Kontash, an impartial vocational expert, also appeared and gave testimony at the hearing. The ALJ posed the following hypothetical to the VE:

> Assume a hypothetical individual of the same age, education, and work experience as the claimant who retains the capacity to perform light work with the following limitations: no more than occasional stooping,

kneeling, crouching, crawling, climbing of ramps and stairs, no balancing or climbing ladders, ropes and scaffolds, the work should avoid concentrated exposure to extreme hot and cold temperatures, vibrations, noise, irritants such as fumes, odors, dust, gasses and poorly ventilated areas. The work should avoid even moderate exposure to hazards such as dangerous machinery and unprotected heights. There should be no more than a moderate noise intensity level in the workplace. There should be no fine visual acuity required, and no night vision required. Work should be limited to simple, routine, repetitive tasks, with no strict production standards, and only occasional decision making required, and only occasional changes in the workplace. Could this hypothetical individual perform the past work of the claimant exactly as performed [in] the DOT?

(R. 74.) After establishing that such a hypothetical person could not perform Mr. Smith's past work in the construction field, the ALJ asked whether other jobs existed in the regional or national economy that such a person could perform. (R. 74-75.) The VE listed three such jobs. (R. 75.) Next, the ALJ asked the VE to assume the same hypothetical person, but limited to performing sedentary, instead of light, work. The VE testified there were no jobs existing in the regional or national economy such a person could perform due to the "educational and nonfunctional limitations." (*Id.*)

The ALJ then asked about customary policies with regard to employee tardiness and absences. The VE testified that a typical employer would tolerate unexcused absences one to two times over the course of employment, and scheduled absences for medical reasons seven to ten times per year. (R. 76.) In addition, the VE stated that a typical employer would permit an individual to be off-task during work hours no more than 10 percent of the time. (*Id.*) When asked what the result would be if an employee exceeded these thresholds, the VE replied "full time competitive employment would not be possible." (*Id.*)

After the VE gave his occupational testimony, the ALJ asked whether "all your testimony today has been consistent to and in accordance with DOT?" The VE answered that it had been. (*Id.*) The ALJ then asked "[t]o the extent that it may be inconsistent with information contained in the DOT...is your testimony here today consistent with your experience in placing individuals in the enumerated jobs or your observations of the enumerated jobs, or your review of other vocational information concerning the performance of the enumerated jobs?" (R.77.) Again, the VE answered in the affirmative. (*Id.*)

### III. THE MOTIONS FOR SUMMARY JUDGMENT

**A. Contentions of the Parties**

Mr. Smith contends that the ALJ's decision was not supported by substantial evidence. Specifically, he argues that (1) the ALJ violated SSR 00-4p by failing to resolve several conflicts between the VE's testimony and the information in the DOT; (2) the ALJ failed to properly determine his RFC; and (3) the ALJ's assessment of his credibility was not supported by substantial evidence. The Commissioner, on the other hand, maintains that (1) the ALJ properly questioned the VE and relied on his testimony; (2) substantial evidence supports the ALJ's RFC determination; and (3) the ALJ appropriately assessed Mr. Smith's credibility.

**B. The Standards**

*1. Summary Judgment*

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of

material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

### 2. Judicial Review

Only a final determination of the Commissioner may receive judicial review. *See* 42 U.S.C. §405(g), (h); *Adams v. Heckler*, 799 F.2d 131,133 (4th Cir. 1986). Moreover, An ALJ's findings will be upheld if supported by substantial evidence. *See Milburn Colliery Co. v. Hicks*, 138 F.3d 524, 528 (4th Cir. 1998). Substantial evidence is "not a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), but that which a "reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Further, the "possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

### 3. Social Security - Claimant's Credibility

"Because he had the opportunity to observe the demeanor and to determine the credibility of the Claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976). We will reverse an ALJ's credibility determination only if the Claimant can show

it was 'patently wrong'" <u>Powers v. Apfel</u>, 207 F.3d 431, 435 (7th Cir. 2000) citing <u>Herr v. Sullivan</u>, 912 F.2d 178, 181 (7th Cir. 1990).

**C. DISCUSSION**

*1. Whether the ALJ Erred in Step Five by Relying on the VE's Testimony*

Mr. Smith's first contention is that he cannot perform the jobs listed by the VE given the limitations of his RFC, and the ALJ erred by failing to notice and discuss these inconsistencies as required by SSR 00-4p. Specifically, he argues that the job of cleaner, which requires a medium exertional level, conflicts with his RFC of light work. In addition, although both garment folder and hand washer require only a light exertional level, he argues that neither of them meet his RFC for "no concentrated exposure to hot and cold temperature extremes, vibrations, noises, and irritants...[and] simple, routine, and repetitive tasks...requir[ing] only occasional decision making." The Commissioner maintains that the ALJ fully complied with SSR 00-4p and was free to rely on the VE's testimony in rendering his decision.

Once it is established that a claimant cannot perform past relevant work, the burden shifts to the Social Security Administration to establish that a significant number of jobs are available in the national economy which the claimant can perform. 20 C.F.R. §§ 404.1520(f), 416.920(f). If the ALJ determines that work does exist in the national economy that the claimant can perform considering his RFC, age, education, and work experience, then the claimant is not disabled. 20 C.F.R. §§ 416.920, 404.1566. In determining whether the claimant can perform other jobs, the ALJ may rely on the DOT as well as vocational expert testimony. 20 C.F.R. § 404.1566.

Ruling 00-4p further clarifies the standards for use of vocational experts who provide evidence at hearings before the presiding administrative law judge. SSR 00-4p, 2000 WL 1898704

(S.S.A.). When the VE gives testimony about the requirements of a job, the ALJ has an affirmative duty to inquire into any possible conflicts between the VE's testimony and the information provided in the DOT. *Id.* However, Ruling 00-4p does not require the ALJ "to conduct an independent investigation into the testimony of witnesses to determine if they are correct" and, if the claimant fails to "bring the vocational expert's mistake to the ALJ's attention, the ALJ...[need not] explain how the conflict was resolved." *Boggs v. Astrue*, 2012 WL 5494566, at *7 (N.D. W.Va. Nov. 13, 2012). In fact, if no conflict is brought to the ALJ's attention at the hearing, Ruling 00-4p is satisfied "'by the ALJ simply asking the VE if his testimony is consistent with the DOT.'" *Street v. Commissioner of Social Sec.*, 2010 WL 13476205, at 5 (E.D. Mich. 2010) (citing *Martin v. Comm'r of Social Sec.*, 170 Fed.Appx. 369, 374-75 (6th Cir. 2006)).

At the hearing, the ALJ described a hypothetical person with Mr. Smith's RFC and asked the VE whether there were jobs in the regional and national economy that such a person could perform. (R. 74-75.) The VE listed three jobs: garment folder (DOT 369.687-018), hand washer (DOT 361.687-030), and house cleaner (DOT 323.687-010). (R. 75.) The ALJ then followed up by asking the VE whether his testimony had been "consistent to and in accordance with DOT?" (R. 76.) The VE answered that it was. (R. 76.) Although no further inquiry was required by the ALJ under SSR 00-4p, the ALJ went even further and asked, "[t]o the extent that it may be inconsistent with information contained in the DOT...is your testimony here today consistent with your experience in placing individuals in the enumerated jobs or your observations of the enumerated jobs, or your review of other vocational information concerning the performance of the enumerated jobs?" (R.77.) Again, the VE answered in the affirmative. (R. 77.) Clearly, on these facts, the ALJ fully complied with Ruling 00-4p and was free to rely on the VE's testimony in determining whether there were

jobs in the national economy that Mr. Smith could perform. Moreover, Mr. Smith did not bring any alleged inconsistencies to the ALJ's attention at the hearing, so there was no need for the ALJ to explain in his decision how he resolved any possible conflicts between the VE's testimony and the DOT.

Further, it should be noted that many of the inconsistencies presented by Mr. Smith do not actually exist. For example, Mr. Smith argues that the occupation of hand washer is inconsistent with his RFC because it involves more than concentrated exposure to vibrations, hot and cold temperatures, and irritants. However, according to the DOT, vibrations, extreme hot and cold, and toxic chemicals are not existing conditions for the job of hand washer. *See* Westlaw Database DICOT 361.687-030. Similarly, Mr. Smith contends that the adopted RFC's limitation of "simple, routine, and repetitive tasks...and only occasional decision making" precludes the position of hand washer because it requires a reasoning level of 2, which requires the ability to "[apply] commonsense understanding to carry out detailed but uninvolved written or oral instructions...[and] [d]eal with problems involving a few concrete variables in or from standardized situations." DOT App. Part C, 1991 WL 688702. This argument is also unavailing because reasoning level 2 has routinely been held to be consistent with an RFC mandating only simple, routine, and repetitive tasks. *See e.g. Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir.2005); *Money v. Barnhart*, 91 Fed. App'x. 210, 215 (3d. Cir. 2004)  Thus, contrary to Mr. Smith's contention, the job of hand washer, as described in the DOT, is consistent with the ALJ's adopted RFC.[7]

---

[7] Because at least one of the jobs listed by the VE is consistent with the ALJ's adopted RFC, there is no need to address any of Mr. Smith's other alleged inconsistencies. *See* 20 CFR 416.966(b) ("Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications.")

Accordingly, this Court finds that the ALJ fully complied with the requirements of SSR 00-4p in relying on the VE's testimony. Therefore, the ALJ's finding that jobs existed in the national economy that Mr. Smith could perform was not in error, and Mr. Smith's argument to the contrary must fail.

### 2. *Whether Substantial Evidence Supports the ALJ's RFC Finding*

Mr. Smith next argues that the ALJ erred by not including all of his limitations in the adopted RFC. The Commissioner contends that the ALJ properly determined that Mr. Smith could perform a limited range of light, unskilled work.

A Residual Functional Capacity is what Claimant can still do despite his limitations. 20 C.F.R. §§ 404.1545, 416.945. Residual Functional Capacity is an assessment based upon all of the relevant evidence. *Id*. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition. *Id*. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used. *Id*. These descriptions and observations must be considered along with medical records to assist the SSA to decide to what extent an impairment keeps a Claimant from performing particular work activities. *Id*. This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the particular types of work a Clamant may be able to do despite their impairments. *Id*. The ultimate responsibility for determining a claimant's RFC is reserved for the ALJ, as the finder of fact. 20 C.F.R. § 416.946.

Here, the ALJ found Mr. Smith to have the following RFC:

> to perform a range of work activity that: requires no more
> than a "light" level of physical exertion; entails no balancing
> or climbing of ladders/ropes/scaffolds and no more than
> occasional performance of other postural activities (i.e.;

> stooping, kneeling, crouching, crawling, climbing of
> ramps/stairs); entails no concentrated exposure to hot and
> cold temperature extremes, vibrations, noises, and irritants
> (such as fumes, odors, dust, gases, and poorly ventilated
> areas); entails not even moderate exposure to hazards (e.g.
> dangerous moving machinery, unprotected heights); entails
> no more than a moderate noise intensity level; requires no
> fine visual acuity nor night vision; entails simple routine and
> repetitive tasks with no strict production standards; entails
> only occasional changes in work setting; and requires only
> occasional decision making.

Mr. Smith raises three arguments regarding this RFC. This Court will consider each in turn.

First, he argues the ALJ failed to consider that his impairments will result in more absences than tolerable. At the hearing, the VE testified that the typical employer would tolerate no more than one to two unexcused absences over the course of employment, and seven to ten scheduled absences for medical reasons in the course of a year. When asked what the result would be if an individual were to exceed these tolerances, the VE answered "[f]ull time competitive employment would not be possible." Mr. Smith contends that because of "the severe nature of his brain injury and the limitations imposed by his injuries, [he] will likely be absent from any job, at any exertional level, far in excess of the amount tolerated by a typical employer as testified to by the VE." However, he provides absolutely no evidence to support this claim. In contrast, the ALJ thoroughly examined the objective medical evidence, none of which supports Mr. Smith's contention that he will excessively absent from work. The ALJ has no duty to account for limitations unsupported by the objective medical evidence.

Mr. Smith's second contention is equally unavailing. He argues that the ALJ erred by not considering that he would be off-task more than 10 percent of the time. The VE testified that a typical employer would permit an employee to be off-task no more than 10 percent of the time

during an eight-hour work day, and if an employee were off task for more than 10 percent of the time, full-time employment would not be possible. Mr. Smith contends that due to his cognitive impairments, he will be "off-task for vastly more than 10% of the workday." To support this contention, he relies on his own testimony at the hearing that his "ability to concentrate is greatly diminished due to his constant head pain that only increases as the day progress." However, as discussed more fully below, the ALJ fully and thoroughly considered Mr. Smith's subjective statements concerning his limitations, and rejected many of them as not entirely credible. This determination is entitled to special deference, and Mr. Smith provides no evidence showing it is wrong. *See Nelson v. Apfel,* 131 F.3d 1228, 1237 (7th Cir. 1997) ( "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference."); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) ("We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'").

In addition, Mr. Smith cites to two medical opinions as proof of his ongoing cognitive impairments. First, he references a worker's compensation medical assessment from 2009, which states that he suffers from "severe problems with...cognitive function" and "brain anatomic changes because of injury with evidence of brain damage." But, the ALJ addressed this exact medical opinion in his decision and accorded it limited weight because it was "performed after the DLI and [is] based on a single examination rather than a longitudinal treating relationship and because the treating source records do not support an [sic] Residual Functional Capacity more limited than that prescribed above."

Mr. Smith also cites the medical report of Clinical Neuropsychologist James Patrick, which states "this is a cognitive disorder, NOS, secondary to traumatic brain injury with skull fracture." This report also has little bearing on Mr. Smith's limitations because it was created on July 16, 2005, less than three weeks after his accident. In his written decision, the ALJ fully detailed Mr. Smith's medical history and found that Mr. Smith's vast improvement in the year after his accident failed to demonstrate the presence of a total disability for a continuous period of 12 months. Thus, a medical opinion given so soon after the accident is not controlling on whether Mr. Smith continues to suffer a cognitive disorder rendering him off-task more than ten percent of the time.

Finally, Mr. Smith contends that "[b]ased on the overwhelming evidence in the record, the ALJ erred by not adopting a sedentary RFC based on the restrictions posed by the ALJ's light RFC." Again, Mr. Smith bases this contention on his own testimony at the hearing, as well as medical assessments that took place shortly after his accident. For the reasons stated above, this evidence has little bearing on Mr. Smith's overall functional capabilities. Additionally, he cites the opinion of Dr. Whetmore, who examined Mr. Smith for worker's compensation purposes and found him permanently and totally disabled. But, Dr. Whetmore's report was made on September 28, 2012, almost a year after the ALJ issued his decision and four years after the period at issue. Further, as discussed above, the ALJ noted in his decision that similar worker's compensation assessment were to be given limited weight in his RFC determination because "such assessments are assessing the claimant under a different program with different standards."

Further, the ALJ thoroughly supported his RFC determination with a very detailed review of all medical opinions in the record, and specifically addressed Mr. Smith's functional limitations by limiting the range of light work he can perform. In fact, he expressly rejected an assessment that

Mr. Smith had a medium exertional capacity, finding that it somewhat understated Mr. Smith's limitations. Moreover, even though he found that the medical evidence failed to substantiate any cognitive issues, the ALJ prescribed several mental limitations in the RFC in order to give Mr. Smith "any and all benefit of the doubt in his favor."

In sum, Mr. Smith's contentions that the ALJ failed to consider all of his limitations are just not true. After noting that Mr. Smith "had been subjected to some significant limitations as a result of a serious head injury," the ALJ dedicated seven pages to explaining why he "is convinced that the above Residual Functional Capacity is justified under the circumstances." Accordingly, this Court finds that the ALJ fully considered the entire record, including all relevant medical opinions and Mr. Smith's own subjective claims, and concluded, based on substantial evidence, that Mr. Smith's various impairments support the adopted RFC.

*3. Whether Substantial Evidence Supports a Finding that Mr. Smith's Subjective Statements Were Not Entirely Credible*

Mr. Smith's final argument is that the ALJ erred in his credibility assessment. Specifically he argues that the ALJ misconstrued references to his prior substance abuse problems in finding him less than credible. The Commissioner contends that the evidence fully supports the ALJ's credibility determination.

The Fourth Circuit stated the standard for evaluating a claimant's subjective statements of pain and other symptoms in *Craig v. Chater*, 76 F.3d 585 (4th Cir. 1996). Under *Craig*, the determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment reasonably likely to cause the symptoms alleged. *Id.* at 594. "It is only after a claimant has met her threshold

obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated." *Id.* at 595. In making this evaluation, the ALJ must consider not only the claimant's subjective statements about his symptoms, but also the claimant's medical history, other objective evidence of pain, and "any other evidence relevant to the severity of the impairment." *Id*. While the ALJ may not reject a claimant's subjective statements solely because they are not substantiated by the available objective evidence, he need not credit them to the extent they are inconsistent with the objective medical evidence. *Id.*

The regulations set forth certain factors for the adjudicator to consider to determine the extent to which the symptoms limit the claimant's capacity to work:

> 1) The individual's daily activities; 2) The location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) Factors that precipitate and aggravate the symptoms; 4) Type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) Any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and 7) Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. 404.1529(c) and 416.929(c) (2010). Accompanying factors that the adjudicator must also consider when assessing the credibility of an individual's statements are provided in SSR 96-7p. These factors include medical signs and laboratory findings; diagnosis, prognosis, and other medical opinions provided by medical sources; and statements and reports about claimant's medical history, treatment and response, prior work record and efforts to work, daily activities,

and other information concerning the claimant's symptoms and how the symptoms affect the individual's ability to work. SSR 96-7p.

Contrary to Mr. Smith's contention that the ALJ only "misconstrued minute references to find [him] less than credible," the record illustrates that the ALJ evaluated Claimant's symptoms in accordance with the two-part test in *Craig* and the factors outlined in 20 C.F.R. 404.1529 and SSR 96-7p. In step one of the *Craig* test, the ALJ found that Mr. Smith "has medically determinable impairments that could reasonably be expected to cause some of the symptoms described, and...he does experience symptoms related to such impairments." Next, in accordance with the factors set out in 20 C.F.R. 404.1529 and SSR 96-7p, the ALJ considered whether Mr. Smith's subjective statements regarding his symptoms were substantiated by, or conflicted with, the objective evidence in the record, and found that "[a] number of considerations undermine the credibility of the claimant's subjective allegations."

First, the ALJ found that Mr. Smith's daily activities during the period at issue significantly contradicted his subjective claims of memory loss, balance problems, and headache pain. For example, in 2006, Mr. Smith reported that he mowed his own lawn and denied experiencing any dizziness or vertigo. Similarly, in 2007, he reported that he maintained his own personal care, prepared his own meals, and did house and yard work. He also indicated that he enjoyed fishing and spending time outdoors, including going to the grocery store once a week. The ALJ concluded that "[t]he fact that a person can in effect do the aforementioned activities does not suggest total disability to the undersigned."

In addition, the ALJ considered Mr. Smith's long-term opiate use in evaluating the credibility of many of his subjective complaints. The ALJ found it apparent from the medical

record that Mr. Smith became dependent on methadone after the accident, and many of his subjective complaints of pain and other symptoms were related to this dependency, as well as his subsequent attempts to wean himself off the drug. Further, the ALJ noted that Mr. Smith's testimony at the hearing that he had gone "cold turkey" off methadone in 2007 and had not needed it since was inconsistent with medical evidence showing that in 2008 he "attempted to obtain methadone or other narcotics from a neurologist under the guise that they previously helped his headaches."

Finally, the ALJ thoroughly detailed Mr. Smith's medical history, noting numerous instances where his subjective claims contradicted the objective medical evidence. For example, Mr. Smith testified at the hearing that he still experienced daily headaches due to his accident, but as early as January 2006, just six months after the accident, he denied having any significant headaches. In addition, the ALJ noted that the medical evidence shows Mr. Smith's strength, range of motion, and balance vastly improved during the period at issue, despite Mr. Smith's claims to the contrary. On January 16, 2006, Dr. Biundo observed Mr. Smith to have full range of motion with the bilateral upper and lower extremities, and his strength was noted as being five out of five. On October 16, 2006, Dr. Biundo reported that his ambulation and balance was much improved. On March 19, 2007, Dr. Biundo again noted that Mr. Smith continued to improve in ambulation and balance. One month later, on April 27, 2007, a medical examination showed a close to normal gait. On November 29, 2007, Dr. Carson reported that Mr. Smith was stable and had made a remarkable recovery.

Based on this thorough and detailed review of the evidence, the ALJ concluded that he "does not find the claimant to be entirely credible" and "does not accept medical findings or

opinions that are based solely or primarily upon the claimant's subjective complaints." Accordingly, this Court finds that the ALJ correctly followed the *Craig* test in evaluating Mr. Smith's subjective symptoms. Additionally, the Court finds that more than substantial evidence exists to support the ALJ's decision to discredit Claimant's subjective complaints.

## IV. RECOMMENDATION

In reviewing the record, the Court concludes that the ALJ's decision was based on substantial evidence, and **RECOMMENDS THAT**:

1.      Mr. Smith's Motion for Summary Judgment be **DENIED**.

2.      Commissioner's Motion for Summary Judgment be **GRANTED** for the reasons set forth.

Any party who appears *pro se* and any counsel of record, as applicable, may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

DATED: August 23, 2013                    /s/ James E. Seibert
                                          JAMES E. SEIBERT
                                          UNITED STATES MAGISTRATE JUDGE